**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **WILLIAM HALL**, individually and on behalf of all others similarly situated,<br><br>**Plaintiff,**<br><br>**v.**<br><br>**McKESSON CORPORATION AND COVERMYMEDS LLC**,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff William Hall ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants McKesson Corporation ("McKesson") and CoverMyMeds LLC ("CoverMyMeds") (collectively, the "McKesson Defendants" or "Defendants"). Plaintiff alleges the facts concerning his own conduct and experiences on personal knowledge. He alleges all other facts upon information and belief after a reasonable investigation by counsel, including review of Defendants' public statements, corporate and privacy materials, regulatory filings, and reports concerning the cybersecurity incident at issue. Many additional facts concerning the affected applications, data tables, security controls, and persons whose information was exfiltrated are exclusively within Defendants' possession and control.

## NATURE OF THE ACTION

1. This is a healthcare data-breach class action arising from Defendants' failure to reasonably safeguard personally identifiable information ("PII") and protected health information ("PHI") that Defendants collected, created, received, processed, maintained, transmitted, and

stored through their prescription-technology, medication-access, and pharmacy-management operations. PII and PHI are referred to collectively as "Private Information."

2. On August 25, 2026, McKesson discovered a cybersecurity incident affecting its information systems. McKesson disclosed the incident in a Form 8-K filed on August 28, 2026, and stated that its investigation was in its early stages.[1]

3. McKesson subsequently stated in a public cybersecurity notice that the incident involved unauthorized access to third-party applications and the exfiltration of data (the "Data Breach"). McKesson has not yet publicly identified all affected applications, the complete categories of data taken, or the final number of affected people.[2]

4. According to contemporaneous cybersecurity reporting, the ShinyHunters extortion group claimed responsibility and claimed that it exfiltrated approximately one terabyte of data over four days and obtained approximately 284 million raw patient-related records or database lines. The reported figure is not a verified count of unique patients; the threat actor stated that it had not determined the number of unique people, and McKesson has not confirmed the threat actor's claims.

5. ShinyHunters reportedly claims that the exfiltrated corpus includes combinations of names, addresses, dates of birth, Social Security numbers, patient identifiers, telephone numbers, email addresses, Medicaid numbers, medical-record numbers, medications, allergies, illnesses, disabilities, appointments, physicians, prescriptions, medication shipments, invoices, and information concerning healthcare providers and clinics. McKesson has not confirmed those specific fields. The reported categories are consistent with information used in prescription, benefit, prior-authorization, provider, medication-access, and pharmacy-management workflows,

---

[1] McKesson Corp., Current Report (Form 8-K), Item 7.01 (Aug. 28, 2026), https://www.sec.gov/Archives/edgar/data/927653/000092765326000247/mck-20260825.htm.
[2] McKesson Corp., *McKesson's Cybersecurity Commitment*, https://www.mckesson.com/utility/cybersecurity/ (last visited Aug. 29, 2026).

but they do not by themselves establish that any particular CoverMyMeds or EnterpriseRx dataset—or Plaintiff's records—was involved.[3]

6. Plaintiff is an Iowa patient with Original Medicare, a Medicare Supplement policy, and separate Medicare Part D prescription-drug coverage administered through UnitedHealthcare and OptumRx. The Medicare Supplement policy supplements Original Medicare but does not administer Plaintiff's outpatient prescription-drug benefit; that benefit is administered through his separate Part D plan.[4]

7. Before the Data Breach, Plaintiff's physician prescribed a high-cost medication that Plaintiff initially obtained through a local retail pharmacy. As his required out-of-pocket payments increased, Plaintiff applied for and was approved for a manufacturer-sponsored financial-assistance program and continued obtaining the medication through the local pharmacy. On or around 2026, Plaintiff learned that he was no longer eligible for the program.

8. Plaintiff transitioned prescription fulfillment to OptumRx Home Delivery. His physician sent the prescription to OptumRx; OptumRx emailed Plaintiff that it was filling the prescription; and Plaintiff called to determine his required copayment. When OptumRx quoted a copayment of approximately $750, Plaintiff instructed OptumRx not to fill the prescription.

9. Plaintiff's prescription history creates several potential CoverMyMeds touchpoints. Counsel's prefiling investigation identified a direct CoverMyMeds integration in the medication manufacturer's public coverage and prior-authorization materials. CoverMyMeds states that its network includes more than 50,000 pharmacies and most health plans and pharmacy benefit

---

[3] Lawrence Abrams, *McKesson Discloses Breach After ShinyHunters Claims Patient Data Theft*, BleepingComputer (Aug. 28, 2026), https://www.bleepingcomputer.com/news/security/mckesson-discloses-breach-after-shinyhunters-claims-patient-data-theft/ (reporting the threat actor's claims concerning access method, approximately one terabyte of exfiltration, approximately 284 million raw patient-related records, asserted data fields, and the absence of independent verification).

[4] Medicare.gov, Learn How Medigap Works, https://www.medicare.gov/health-drug-plans/medigap/basics/how-medigap-works (last visited Aug. 29, 2026) (explaining that Medigap policies sold after 2005 do not include prescription-drug coverage and that a beneficiary may obtain separate Part D coverage).

managers and that pharmacy-initiated prior-authorization requests commonly begin when a prescription claim is rejected.[5]

10. Plaintiff does not allege that every retail-pharmacy claim, manufacturer-assistance transaction, or OptumRx transaction necessarily passed through CoverMyMeds, or that OptumRx uses CoverMyMeds exclusively. But based on the applicable plan's utilization-management requirements, Plaintiff's repeated retail-pharmacy fills, the manufacturer-assistance and coverage-review process, the manufacturer's publicly documented CoverMyMeds integration, CoverMyMeds' pharmacy and payer network, and the later OptumRx transaction, Plaintiff reasonably alleges upon information and belief that CoverMyMeds processed at least one transaction concerning him.

11. Plaintiff also has a separate potential McKesson data pathway independent of CoverMyMeds. Upon information and belief, a healthcare provider involved in Plaintiff's surgical care used McKesson's EnterpriseRx pharmacy-management system in its pharmacy operations. Plaintiff omits the provider's identity, the dates and nature of the care, any procedure, and any related medication from this public pleading to avoid unnecessary disclosure of his medical information.

12. McKesson describes EnterpriseRx as a fully hosted, cloud-based pharmacy-management platform that hosts and centralizes pharmacy data, provides real-time patient-profile access, and supports prescription processing, clinical workflows, pricing, inventory, and reporting.

13. Based on the provider's use of EnterpriseRx and the nature of its pharmacy operations, Plaintiff reasonably believes and alleges upon information and belief that one or more

[5] CoverMyMeds, What Is CoverMyMeds?, https://www.covermymeds.com/main/support/general/what-is-covermymeds/ (last visited Aug. 29, 2026) (stating that the CoverMyMeds network includes more than 50,000 pharmacies and most health plans and pharmacy benefit managers); CoverMyMeds, 2020 Medication Access Report, https://insights.covermymeds.com/medication-access-report/2020 (last visited Aug. 29, 2026) (stating that prior-authorization requests are typically initiated at the pharmacy when an insurance claim is rejected).

pharmacy-related transactions concerning him were processed through EnterpriseRx, thereby creating or maintaining patient-level pharmacy data. The exact transactions, data fields, retention locations, and responsible McKesson entity are within Defendants', the provider's, and their vendors' possession and control.

14. Plaintiff does not allege that EnterpriseRx contained his complete medical record, the nature of his care, any procedure or implant information, or medical-surgical supply-chain data. Nor does Plaintiff allege that McKesson has confirmed EnterpriseRx as an affected application. Those questions remain subject to McKesson's investigation and discovery.

15. Upon information and belief, through one or both of these independent pathways, Defendants and/or McKesson pharmacy-technology business units acting under McKesson's ownership, direction, or enterprise security governance obtained and maintained Plaintiff's Private Information, including information identifying Plaintiff, his prescriptions and fill history, prescribing and dispensing providers, pharmacy information, Part D coverage, manufacturer-assistance information, benefit and copayment information, and clinical information used in medication processing or coverage review.

16. Based on the nature of Plaintiff's prescription and provider-side pharmacy transactions, McKesson's integrated prescription-technology and pharmacy-management operations, the reported contents of the exfiltrated patient-data corpus, and the scope of the attack, Plaintiff reasonably believes and alleges upon information and belief—subject to confirmation through Defendants' forensic investigation and records uniquely within their possession—that his Private Information was included in the data accessed and exfiltrated in the Data Breach.

17. Plaintiff does not identify any medication, diagnosis, medical condition, healthcare provider, treatment date, procedure, implant, or other clinical detail in this public pleading. Plaintiff will provide any patient-specific information necessary to litigate standing, causation, typicality, or damages through appropriate confidential procedures.

18. The Data Breach was not a misplaced-device event or an accidental disclosure. It was a targeted intrusion and alleged theft by a financially motivated extortion group. Upon information and belief, unauthorized criminals acquired readable copies of patient data for purposes of extortion, exploitation, sale, dissemination, or other misuse.

19. As a direct result, Plaintiff and Class members have suffered an actual loss of privacy and confidentiality, loss of control over their Private Information, time and effort spent investigating and responding to the breach, and a substantial and continuing risk of identity theft, medical identity theft, healthcare fraud, targeted phishing, account takeover, and other misuse of persistent identity and health information.

## PARTIES

20. Plaintiff William Hall is a natural person, citizen of the State of Iowa, and resident of Pottawattamie County, Iowa.

21. Plaintiff has Original Medicare Parts A and B, a Medicare Supplement policy, and separate Medicare Part D prescription-drug coverage administered through UnitedHealthcare and OptumRx.

22. Plaintiff's Medicare Supplement policy does not provide his outpatient prescription-drug benefit. The relevant prescription claims, utilization-management requirements, prior authorization, and copayments were administered through his separate Part D plan.

23. Before the Data Breach, Plaintiff's physician prescribed a high-cost medication. Plaintiff initially obtained the prescription through a local retail pharmacy and received repeated fills there.

24. The applicable Part D formulary subjected the medication to prior authorization and quantity limits. Plaintiff's repeated covered fills indicate that the plan's applicable coverage

requirements had been satisfied at least during part of the relevant period.[6]

25. As Plaintiff's required out-of-pocket payments increased, he applied for and was approved for a manufacturer-sponsored financial-assistance program and continued obtaining the medication through the local retail pharmacy while receiving assistance.

26. In 2026, at approximately the time he moved prescription fulfillment to OptumRx Home Delivery, Plaintiff learned that he no longer qualified for the assistance program.

27. Plaintiff's physician sent the prescription to OptumRx Home Delivery. OptumRx emailed Plaintiff that the prescription was being filled. Plaintiff called OptumRx to determine the copayment and, after OptumRx quoted a copayment of approximately $750, instructed OptumRx not to fill the prescription.

28. Plaintiff's cancellation did not necessarily eliminate prescription, claim-adjudication, coverage, benefit, prior-authorization, manufacturer-assistance, communication, audit, or transaction records already created. To the extent CoverMyMeds participated, Plaintiff reasonably believes the resulting records persisted in CoverMyMeds, McKesson, and/or connected systems subject to applicable operational, audit, security, and retention practices.

29. Counsel's prefiling investigation identified a direct CoverMyMeds integration in the medication manufacturer's public coverage and prior-authorization materials. Plaintiff omits the medication, manufacturer, and program names to avoid unnecessary disclosure of his medical information.

30. CoverMyMeds states that its network includes more than 50,000 pharmacies and most health plans and pharmacy benefit managers and that prior-authorization requests are

---

[6] UnitedHealthcare, AARP MedicareRx Preferred from UHC (PDP): Complete Drug List (Formulary) 2025, PDEX25PD0255336_001 (2025), https://www.uhc.com/medicare/alphadog/PDEX25PD0255336_001; UnitedHealthcare, AARP MedicareRx Preferred from UHC (PDP): Complete Drug List (Formulary) 2026, PDEX26PD0348627_001 (2026), https://www.uhc.com/medicare/alphadog/PDEX26PD0348627_001 (setting out drug-specific prior-authorization and quantity-limit requirements).

commonly initiated at the pharmacy when an insurance claim is rejected.[7]

31. OptumRx publicly identifies CoverMyMeds as one of several electronic prior-authorization portals and explains that an electronic request may include a patient's name, member identifier, medication, diagnosis, prior treatments, clinical responses, and chart notes.[8]

32. Plaintiff does not allege that the retail pharmacy automatically routed every claim or cost inquiry through CoverMyMeds, that his manufacturer-assistance application itself necessarily used CoverMyMeds, that the $750 copayment quote alone proves a prior authorization, or that OptumRx uses CoverMyMeds exclusively.

33. Rather, the combination of the medication's coverage requirements; repeated retail-pharmacy fills; escalating cost and manufacturer-assistance activity; the manufacturer's publicly documented CoverMyMeds integration; CoverMyMeds' extensive pharmacy and payer network; and the later OptumRx Home Delivery transaction provides a reasonable factual basis to allege upon information and belief that CoverMyMeds processed at least one prescription, coverage, benefit, assistance, or prior-authorization transaction concerning Plaintiff.

34. The precise platform, request key, transaction date, data fields, retention location, and audit history for Plaintiff's prescription transactions are maintained by Defendants, the retail pharmacy, OptumRx, Plaintiff's prescribing providers, the medication manufacturer, and/or their vendors and are not presently accessible to Plaintiff without records requests or discovery.

35. Upon information and belief, the Private Information Defendants processed in connection with one or more transactions concerning Plaintiff included some combination of his

---

[7] CoverMyMeds, What Is CoverMyMeds?, https://www.covermymeds.com/main/support/general/what-is-covermymeds/ (last visited Aug. 29, 2026) (stating that the CoverMyMeds network includes more than 50,000 pharmacies and most health plans and pharmacy benefit managers); CoverMyMeds, 2020 Medication Access Report, https://insights.covermymeds.com/medication-access-report/2020 (last visited Aug. 29, 2026) (stating that prior-authorization requests are typically initiated at the pharmacy when an insurance claim is rejected).

[8] Optum Rx, Submit an Electronic Prior Authorization (e-PA), https://business.optum.com/en/pharmacy-services/electronic-prior-authorization.html (last visited Aug. 29, 2026) (identifying CoverMyMeds, Surescripts, PreCheck MyScript, DrFirst, CenterX, and Allscripts as available e-PA portals and describing the patient and clinical information used in an e-PA request).

name, address, telephone number, email address, date of birth, Medicare or Part D member identifiers, prescription and fill history, prescribing-provider information, pharmacy information, coverage and benefit information, manufacturer-assistance information, prior-authorization status, copayment information, and clinical criteria used in connection with coverage review. Whether Defendants also maintained additional identifiers, including a Social Security number or medical-record number, is uniquely within Defendants' knowledge.

36. Plaintiff has not received a completed individualized notice from Defendants identifying the exact fields taken. McKesson has stated that its investigation remains in an early stage. The absence of a completed individualized notice at this preliminary stage does not establish that Plaintiff's information was excluded from the exfiltrated corpus.

37. After learning of the Data Breach, Plaintiff spent time reviewing his insurance, pharmacy, prescription, and assistance-program history; identifying the entities that handled his prescription transactions; discussing his prescription-processing history; and investigating whether Defendants possessed and exposed his Private Information. Plaintiff will continue to spend time monitoring medical, insurance, financial, and communications records for misuse.

38. Plaintiff also has a separate provider-side pharmacy pathway. Upon information and belief, a healthcare provider involved in Plaintiff's care used McKesson EnterpriseRx as its pharmacy-management system during the relevant period.

39. Plaintiff does not identify the provider, the dates or nature of the care, any procedure, or any medication associated with that provider-side pathway because those details are unnecessary to establish the existence of the McKesson pharmacy-technology relationship and would unnecessarily disclose medical information.

40. McKesson states that EnterpriseRx hosts and centralizes pharmacy data, supports real-time patient profiles, and centralizes prescription processing and related pharmacy

workflows.[9]

41. Based on the provider's use of EnterpriseRx and the nature of the provider-side pharmacy operations, Plaintiff reasonably believes and alleges upon information and belief that one or more pharmacy-related transactions concerning him were processed, verified, logged, or otherwise maintained through EnterpriseRx. The provider, Defendants, and their vendors possess the records needed to identify the exact transaction and data fields.

42. Plaintiff does not allege that EnterpriseRx contained his complete clinical record, any procedure or implant information, or medical-surgical supply-chain data, and he does not allege that McKesson has confirmed EnterpriseRx as an affected application.

43. Defendant McKesson Corporation is a Delaware corporation with its principal place of business and principal executive offices at 6555 State Highway 161, Irving, Texas 75039. McKesson is therefore at home in Texas and within this District.

44. McKesson is a large healthcare-services, pharmaceutical-distribution, and pharmacy-technology enterprise. It reports a Prescription Technology Solutions segment that connects patients, pharmacies, providers, pharmacy benefit managers, health plans, and biopharmaceutical companies and provides electronic prior authorization, prescription price transparency, benefit insight, patient enrollment, and dispensing-support services. McKesson also markets EnterpriseRx through its Pharmacy Systems business as a hosted pharmacy-management platform for retail, outpatient, health-system, specialty, central-fill, and mail-order pharmacy

[9] McKesson Corp., EnterpriseRx Pharmacy Management Software, McKesson, https://www.mckesson.com/pharmacy-technology/solutions-software/pharmacy-management-software/enterpriserx-pharmacy-management-system/ (last visited Aug. 29, 2026) (describing real-time patient-profile access and centralized pharmacy operations); McKesson Corp., EnterpriseRx Fact Sheet, McKesson, https://www.mckesson.com/siteassets/documents/pharmacies/enterpriserx-fact-sheet/ (last visited Aug. 29, 2026) (stating that EnterpriseRx hosts pharmacy data and centralizes it across pharmacy locations); McKesson Corp., EnterpriseRx Is Built for Modern Pharmacy Operations, McKesson, https://www.mckesson.com/stories-insights/enterpriserx-is-built-for-modern-pharmacy-operations/ (last visited Aug. 29, 2026) (describing EnterpriseRx as a cloud-based platform for retail, health-system, and specialty pharmacies that centralizes prescription processing, clinical workflows, inventory, pricing, and reporting).

operations.[10]

45. Defendant CoverMyMeds LLC is a limited liability company headquartered at 910 John Street, Columbus, Ohio 43222. McKesson completed its acquisition of CoverMyMeds in 2017 and reports CoverMyMeds as part of its prescription-technology operations.

46. CoverMyMeds operates electronic prior-authorization, benefit-verification, medication-access, prescription-management, patient-support, affordability, and related services. CoverMyMeds' public terms and privacy materials state that it processes PHI in the United States and acts as a HIPAA business associate when it creates, receives, maintains, or transmits PHI on behalf of covered entities.

47. EnterpriseRx is branded and marketed within McKesson's pharmacy-technology portfolio. McKesson states that the platform hosts and centralizes pharmacy data and patient profiles and supports prescription processing and related pharmacy workflows. The precise McKesson legal entity that contracted with Plaintiff's provider and the allocation of hosting, cybersecurity, data-governance, and incident-response responsibilities are within McKesson's possession and control. Plaintiff reserves the right to amend as those facts are confirmed.

48. Upon information and belief, at all relevant times McKesson, CoverMyMeds, and one or more McKesson pharmacy-technology business units participated in, or allocated among themselves, responsibility for the collection, storage, processing, security, governance, and incident response applicable to the Private Information at issue. The precise division of responsibility, the identity of any additional responsible McKesson entity, and whether the relevant applications were operated directly, through controlled affiliates, or through third-party service

---

[10] McKesson Corp., Pharmacy Systems & Technology, McKesson, https://www.mckesson.com/pharmacy-technology/business-units/mckesson-pharmacy-systems/ (last visited Aug. 29, 2026); McKesson Corp., Annual Report (Form 10-K), at 4 (May 8, 2012), https://www.sec.gov/Archives/edgar/data/927653/000119312512204736/d318930d10k.htm (describing EnterpriseRx as a software-as-a-service pharmacy-management system used by retail, outpatient, central-fill, specialty, mail-order, and health-system pharmacies).

providers are uniquely within Defendants' knowledge and may be pleaded in the alternative under Federal Rule of Civil Procedure 8(d).

## JURISDICTION AND VENUE

49. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class contains more than 100 members; at least one Class member, including Plaintiff, is a citizen of a state different from at least one Defendant; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

50. Minimal diversity exists because Plaintiff is an Iowa citizen and McKesson is a citizen of Delaware and Texas. CoverMyMeds' citizenship is determined by the citizenship of each of its members; the identities and citizenship of those members are not publicly available and are within Defendants' control. Their citizenship does not defeat CAFA jurisdiction because Plaintiff and McKesson are minimally diverse.

51. This Court has general personal jurisdiction over McKesson because McKesson maintains its principal place of business in Irving, Texas.

52. This Court has specific personal jurisdiction over CoverMyMeds because, upon information and belief, CoverMyMeds purposefully operates as part of McKesson's Texas-headquartered Prescription Technology Solutions segment and participates in enterprise cybersecurity, data-governance, third-party-application, and incident-response functions that McKesson directs or materially supervises from this District. CoverMyMeds also purposefully provides medication-access services to Texas providers, pharmacies, payers, and patients through its nationwide platform.

53. Plaintiff's claims against CoverMyMeds arise out of or relate to those forum contacts because the alleged failures include enterprise security, governance, oversight, and incident-response conduct directed from McKesson's Texas headquarters and applied to

CoverMyMeds-integrated data and applications. The precise location and allocation of those functions are uniquely within Defendants' control and will be confirmed through jurisdictional discovery.

54. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in or were directed from this District, including McKesson's corporate cybersecurity governance, risk-management program, third-party application oversight, data-protection decisions, executive supervision, and response to the Data Breach.

55. For venue purposes, McKesson resides in this District under 28 U.S.C. § 1391(c)(2), and CoverMyMeds is deemed to reside in any district in Texas in which its contacts would support personal jurisdiction if Texas were a separate state. 28 U.S.C. § 1391(d). Venue is proper under § 1391(b)(2) for the independent reasons stated above.

56. Assignment to the Dallas Division is proper because McKesson's principal executive offices are located in Irving, Dallas County, Texas.

## CHOICE OF LAW

57. Texas has the most significant relationship to the common security conduct alleged because McKesson is headquartered in this District and, upon information and belief, the challenged enterprise governance, access-control, data-protection, and incident-response decisions occurred or were directed from Texas. Plaintiff therefore pleads Texas law where applicable and, in the alternative, Iowa or other applicable state law under Federal Rule of Civil Procedure 8(d), subject to discovery and the Court's choice-of-law determination.

## FACTUAL ALLEGATIONS

### A. Defendants' Integrated Prescription-Technology, Medication-Access, and Pharmacy-Management Operations

58. McKesson operates at a critical point in American healthcare and pharmaceutical infrastructure. Through its prescription-technology and pharmacy-systems businesses, it connects patients, prescribers, pharmacies, pharmacy benefit managers, health plans, drug manufacturers, and health-system pharmacies and facilitates medication access and prescription processing at substantial scale.

59. McKesson's public filings describe Prescription Technology Solutions as providing electronic prior authorization, prescription price transparency, benefit insight, dispensing support, and patient enrollment. McKesson reports connections with most electronic health-record systems, more than 50,000 pharmacies, more than one million providers, and most pharmacy benefit managers and health plans.[11]

60. CoverMyMeds is a core part of those operations. CoverMyMeds markets electronic prior-authorization solutions for all drugs and health plans, and its terms describe services including prior authorization and assistance, benefit verification and investigation, patient financial assistance, prescription management and follow-up communications, patient enrollment, and hub services.[12]

61. EnterpriseRx provides a separate McKesson pharmacy-data channel. McKesson describes EnterpriseRx as a fully hosted, cloud-based pharmacy-management platform designed

---

[11] McKesson Corp., Annual Report (Form 10-K), at 8–9 (May 8, 2026), https://www.sec.gov/Archives/edgar/data/927653/000092765326000069/mck-20260331.htm.

[12] CoverMyMeds, *Prior Authorization Solutions*, https://www.covermymeds.health/our-solutions/prior-authorization (last visited Aug. 29, 2026); CoverMyMeds, *Terms of Service* (July 1, 2023), https://www.covermymeds.health/about/privacy/terms-of-service.

for retail, health-system, and specialty pharmacy operations.[13]

62. McKesson further states that EnterpriseRx hosts pharmacy data, centralizes it across pharmacy locations, provides real-time patient-profile access, and centralizes prescription processing, clinical workflows, pricing, inventory, and reporting.[14]

63. A prior-authorization transaction can require much more than a patient's name and drug. Depending on the medication and plan criteria, an electronic request may include a patient's date of birth, member identifier, diagnosis, clinical history, prior medications tried or failed, laboratory information, and chart notes.

64. OptumRx's own electronic-prior-authorization materials state that chart notes can be securely uploaded as part of the ePA process and that OptumRx uses drug-specific criteria for initial authorizations, reauthorizations, step therapy, and non-formulary exceptions.

65. For Medicare Part D patients in certain specialty or infusion workflows, OptumRx publicly describes a process in which OptumRx creates a prior-authorization request in CoverMyMeds, sends the request key to the prescriber, and the prescriber accesses CoverMyMeds using the request key, the patient's last name, and date of birth before reviewing and submitting

---

[13] McKesson Corp., EnterpriseRx Pharmacy Management Software, McKesson, https://www.mckesson.com/pharmacy-technology/solutions-software/pharmacy-management-software/enterpriserx-pharmacy-management-system/ (last visited Aug. 29, 2026) (describing real-time patient-profile access and centralized pharmacy operations); McKesson Corp., EnterpriseRx Fact Sheet, McKesson, https://www.mckesson.com/siteassets/documents/pharmacies/enterpriserx-fact-sheet/ (last visited Aug. 29, 2026) (stating that EnterpriseRx hosts pharmacy data and centralizes it across pharmacy locations); McKesson Corp., EnterpriseRx Is Built for Modern Pharmacy Operations, McKesson, https://www.mckesson.com/stories-insights/enterpriserx-is-built-for-modern-pharmacy-operations/ (last visited Aug. 29, 2026) (describing EnterpriseRx as a cloud-based platform for retail, health-system, and specialty pharmacies that centralizes prescription processing, clinical workflows, inventory, pricing, and reporting).

[14] McKesson Corp., EnterpriseRx Pharmacy Management Software, McKesson, https://www.mckesson.com/pharmacy-technology/solutions-software/pharmacy-management-software/enterpriserx-pharmacy-management-system/ (last visited Aug. 29, 2026) (describing real-time patient-profile access and centralized pharmacy operations); McKesson Corp., EnterpriseRx Fact Sheet, McKesson, https://www.mckesson.com/siteassets/documents/pharmacies/enterpriserx-fact-sheet/ (last visited Aug. 29, 2026) (stating that EnterpriseRx hosts pharmacy data and centralizes it across pharmacy locations); McKesson Corp., EnterpriseRx Is Built for Modern Pharmacy Operations, McKesson, https://www.mckesson.com/stories-insights/enterpriserx-is-built-for-modern-pharmacy-operations/ (last visited Aug. 29, 2026) (describing EnterpriseRx as a cloud-based platform for retail, health-system, and specialty pharmacies that centralizes prescription processing, clinical workflows, inventory, pricing, and reporting).

the request.[15]

66. CoverMyMeds's Terms of Service state that CoverMyMeds processes PHI in the United States, provides services relating to prior authorization and medication access, and uses patient information provided through its portal as necessary to perform those services.

67. CoverMyMeds's Business Associate Agreement states that CoverMyMeds has access to, creates, or receives PHI to perform its services and undertakes to use appropriate safeguards, implement administrative, physical, and technical safeguards, protect the confidentiality, integrity, and availability of electronic PHI, comply with the minimum-necessary principle, and report unauthorized uses, disclosures, breaches, and security incidents.

68. CoverMyMeds's public privacy notice further represents that it protects information using physical, electronic, and administrative safeguards and limits employee, contractor, and agent access to those who need the information to perform services and are subject to confidentiality obligations.[16]

69. Plaintiff does not seek to enforce the CoverMyMeds Business Associate Agreement as a third-party beneficiary. Rather, Defendants' published privacy and security undertakings are evidence of the concrete safeguards Defendants represented, implemented, and assumed when accepting and processing patient PHI.

70. Because Defendants deliberately assembled and profited from a broad network that receives patient data indirectly from providers, pharmacies, pharmacy benefit managers, and payers—and because McKesson separately supplies hosted pharmacy-management systems to provider and health-system pharmacies—a patient need not create a CoverMyMeds or

[15] Optum Rx, *Submit an Electronic Prior Authorization (e-PA)*, https://business.optum.com/en/pharmacy-services/electronic-prior-authorization.html (last visited Aug. 29, 2026).
[16] CoverMyMeds, *Business Associate Agreement* §§ 2(b)–(d), 2(j), 3(a) (Nov. 29, 2023), https://www.covermymeds.health/about/privacy/terms-of-service/business-associate-agreement; CoverMyMeds, *Privacy Notice* (Jan. 22, 2026), https://www.covermymeds.health/about/privacy/privacy-notice.

EnterpriseRx account or knowingly interact with McKesson for McKesson-affiliated systems to acquire and maintain identifiable patient information.

**B. Plaintiff's Prescription, Prior-Authorization, and Pharmacy-Management Data**

71. Plaintiff's prescription transactions required his prescribers, retail pharmacy, UnitedHealthcare, OptumRx, and any medication-access vendors to identify him, verify coverage, associate him with a specific prescription and prescriber, determine benefit and copayment information, and create and maintain transaction records.

72. Plaintiff's Medicare Supplement policy did not administer the prescription benefit. The prescription benefit was administered through his separate Medicare Part D plan.

73. Plaintiff repeatedly obtained a high-cost prescription through a local retail pharmacy. The applicable Part D formulary subjected the medication to prior authorization and quantity limits.

74. When Plaintiff's required out-of-pocket payments increased, he applied for and was approved for manufacturer-sponsored financial assistance and continued obtaining the medication through the local retail pharmacy. Plaintiff later learned that he was no longer eligible for the assistance program.

75. Earlier in 2026, Plaintiff transitioned to OptumRx Home Delivery. His physician sent the prescription to OptumRx; OptumRx emailed that it was filling the prescription; and OptumRx quoted Plaintiff a copayment of approximately $750. Plaintiff then instructed OptumRx not to fill the prescription.

76. Counsel's prefiling investigation identified a direct potential CoverMyMeds pathway in the medication manufacturer's public coverage-check and prior-authorization materials. Plaintiff omits the medication, manufacturer, and program names to avoid unnecessary disclosure of his medical information.

77. A separate potential pathway exists at the pharmacy and payer level. CoverMyMeds states that its network includes more than 50,000 pharmacies and most health plans and pharmacy benefit managers and that prior-authorization requests commonly begin at the pharmacy after a claim rejection.

78. Plaintiff does not allege that every transaction in this sequence used CoverMyMeds. But the combined facts materially strengthen the inference that at least one coverage, benefit, manufacturer-assistance, pharmacy, or prior-authorization transaction concerning Plaintiff was processed through CoverMyMeds. Plaintiff alleges that fact upon information and belief because the transaction-level records are controlled by Defendants and third parties.

79. Upon information and belief, CoverMyMeds and McKesson received or created patient-level records reflecting Plaintiff's identity, prescription and fill history, prescriber, pharmacy, Part D benefit, manufacturer-assistance history, coverage status, copayment, and related clinical or authorization information.

80. Upon information and belief, those records were stored, replicated, logged, queried, transmitted, or otherwise maintained in one or more McKesson-controlled, CoverMyMeds-controlled, or McKesson-integrated third-party applications and data repositories.

81. The exact architecture of the relevant applications, including whether the records resided in Salesforce, Snowflake, another cloud service, a data warehouse, an audit repository, or a connected system, is exclusively within Defendants' knowledge.

82. Upon information and belief, any CoverMyMeds transaction and audit information concerning Plaintiff remained in operational, compliance, security, or accounting systems after individual retail-pharmacy fills, manufacturer-assistance events, and the cancelled OptumRx order. The exact retention period and location of those records are uniquely within Defendants' knowledge.

### C. Plaintiff's Separate Provider-Side EnterpriseRx Pathway

83. Upon information and belief, a healthcare provider involved in Plaintiff's care used McKesson EnterpriseRx as its pharmacy-management system during the relevant period. Counsel's investigation identified public materials supporting that provider-to-EnterpriseRx relationship.

84. Plaintiff does not identify the provider, dates or nature of care, any procedure, or any medication associated with this pathway. Those details are unnecessary to plead the existence of a separate McKesson pharmacy-system relationship and would unnecessarily disclose Plaintiff's medical information.

85. EnterpriseRx is a hosted pharmacy-management platform that McKesson states holds and centralizes pharmacy data and patient profiles and supports prescription processing and related pharmacy workflows.

86. Based on the provider's use of EnterpriseRx and the nature of its pharmacy operations, Plaintiff reasonably believes and alleges upon information and belief that one or more pharmacy-related transactions concerning him were entered, verified, processed, logged, or otherwise maintained through EnterpriseRx. Such records could include patient identity, prescriber or provider, prescription or medication-order, dispensing or verification, coverage or payment, and audit information. The exact records are controlled by McKesson, the provider, and their vendors.

87. Plaintiff does not allege that EnterpriseRx contained his complete medical record, the nature of his care, any procedure or implant information, or medical-surgical supply-chain data. Plaintiff further does not allege that McKesson has confirmed EnterpriseRx as an application affected by the Data Breach. Whether Plaintiff's EnterpriseRx-related records were stored in or accessible through an affected application is a question for McKesson's forensic investigation and discovery.

**D. The August 2026 Data Breach**

88. McKesson discovered the Data Breach on August 25, 2026 and disclosed it publicly on August 28, 2026.

89. McKesson confirmed that unauthorized actors accessed third-party applications and exfiltrated data. McKesson stated that it activated incident-response procedures and engaged outside cybersecurity specialists, but it has not yet disclosed the complete affected population or all data elements taken.

90. According to contemporaneous reporting, ShinyHunters claims that it obtained access through social engineering and identity-system compromise, accessed McKesson-connected Salesforce and Snowflake environments, and exfiltrated approximately one terabyte of data over four days between August 21 and August 25, 2026.

91. The group reportedly claims that the Snowflake data included approximately 284 million raw patient-related records. The group clarified that the figure represents records or rows rather than unique individuals and stated that it had not completed a unique-person count.

92. The group reportedly claims that the stolen data included patient identity, contact, government or benefit identifiers, medical-record identifiers, medications, allergies, illnesses, disabilities, providers, appointments, prescriptions, medication shipments, and invoices. McKesson has not yet publicly confirmed those specific fields.

93. Upon information and belief, one or more affected datasets contained patient, prescription, provider, benefit, medication-access, or pharmacy-management records generated by, received through, or accessible to McKesson's Prescription Technology Solutions, CoverMyMeds, Pharmacy Systems, EnterpriseRx, and/or related operations. Defendants have not yet publicly identified the business lines, applications, or tables involved.

94. McKesson has not publicly confirmed that EnterpriseRx—or any particular Medical-Surgical, Oncology, Specialty, Pharmacy Systems, or other business segment or

application—was affected. Plaintiff does not allege otherwise. McKesson has stated only that unauthorized actors accessed third-party applications and exfiltrated data and that its investigation remains ongoing.[17]

95. The close correspondence between the reported corpus fields and information used in prior-authorization, medication-access, and pharmacy-management workflows, together with Plaintiff's two independent potential McKesson data pathways and the alleged scale and integration of the affected systems, supports Plaintiff's reasonable belief that the affected data included patient records concerning him. Plaintiff recognizes that forensic confirmation remains within Defendants' exclusive control.

96. Upon information and belief, and subject to confirmation through the affected-data inventories and forensic evidence within Defendants' possession, Plaintiff's Private Information was contained in data actually accessed and exfiltrated by unauthorized criminal actors in a targeted intrusion.

97. Defendants possess the data maps, affected-table inventories, access logs, export logs, patient identifiers, notification lists, and forensic results necessary to confirm Plaintiff's inclusion. Plaintiff cannot obtain those records without Defendants' investigation, regulatory notices, records production, or discovery.

**E. Defendants' Security Obligations and Failures**

98. Defendants knew that their systems contained unusually sensitive and persistent information. McKesson has publicly acknowledged that it and its vendors electronically transmit, process, store, and host PHI and other personal information; that healthcare companies are increasingly targeted; and that cybersecurity incidents can compromise such information.[18]

---

[17] McKesson Corp., *McKesson's Cybersecurity Commitment*, https://www.mckesson.com/utility/cybersecurity/ (last visited Aug. 29, 2026).
[18] McKesson Corp., Annual Report (Form 10-K), at 17–18, 26–27 (May 8, 2026), https://www.sec.gov/Archives/edgar/data/927653/000092765326000069/mck-20260331.htm.

99. Defendants also knew that healthcare, pharmaceutical, identity, and medication data are highly valuable to criminals and can be used for identity theft, medical identity theft, prescription fraud, insurance fraud, targeted phishing, impersonation, and extortion.

100. The likelihood of social-engineering and cloud-application attacks against large healthcare enterprises was well known before August 2026. Reasonable security therefore required controls designed not merely to prevent malware, but also to prevent stolen or socially engineered credentials from providing broad access to readable patient data.

101. Given Defendants' size, risk profile, and possession of large volumes of PHI, reasonable security measures appropriate to their environment included, among other things: phishing-resistant multifactor authentication; rigorous help-desk and account-recovery verification; least-privilege and role-based access; session and token controls; segmentation of sensitive patient data; monitoring for anomalous logins; data-loss-prevention controls; alerts for bulk queries and exports; encryption or tokenization; secure configuration of third-party SaaS and cloud applications; vendor governance; and tested incident-response procedures.

102. Upon information and belief, Defendants failed to implement, enforce, or properly configure one or more of those safeguards. The alleged ability of a threat actor to obtain broad access through social engineering and remove approximately one terabyte of information over multiple days without effective prevention or interruption supports that inference.

103. Upon information and belief, Defendants failed to adequately verify identity before granting or resetting access, failed to constrain compromised credentials or sessions, failed to limit the accessible scope of patient data, failed to detect anomalous bulk access or exports promptly, and failed to prevent exfiltrated patient data from being readable and useful to the attacker.

104. Upon information and belief, Defendants also failed to appropriately inventory and minimize retained patient data, segment CoverMyMeds, EnterpriseRx, prescription-technology, and pharmacy-management data from broadly accessible third-party applications, monitor

subcontractor and application access, and test whether enterprise controls would prevent a vishing or session-compromise attack.

105. Defendants' precise control deficiencies, risk assessments, audit findings, exceptions, security tickets, identity-provider logs, third-party contracts, data-retention practices, and warnings are exclusively within their possession and control.

106. Texas law requires businesses to implement and maintain reasonable procedures to protect sensitive personal information collected or maintained in the regular course of business from unlawful use or disclosure. Tex. Bus. & Com. Code § 521.052(a). Plaintiff invokes that statute as evidence of public policy and the standard of reasonable care, not as a standalone implied private cause of action.[19]

107. The HIPAA Security Rule likewise requires covered entities and business associates to maintain administrative, physical, and technical safeguards appropriate to protect electronic PHI. Plaintiff does not assert a private cause of action under HIPAA; he invokes those standards as evidence of Defendants' recognized duties and undertakings.[20]

108. Defendants' own privacy, business-associate, and security representations confirm that they understood and assumed obligations to protect patient information using defined administrative, physical, technical, access-control, confidentiality, minimum-necessary, incident-reporting, and mitigation measures.

**F. Plaintiff's and Class Members' Injuries**

109. Upon information and belief, the unauthorized acquisition and disclosure of Plaintiff's Private Information to a criminal extortion group caused an actual invasion of Plaintiff's privacy and loss of the confidentiality and control that attached to his medical and prescription

---

[19] Tex. Bus. & Com. Code Ann. § 521.052(a) (West 2026).
[20] 45 C.F.R. §§ 164.306(a), 164.308(a), 164.312 (2025).

information.

110. Plaintiff disclosed or permitted the disclosure of his information solely for limited healthcare, pharmacy-benefit, medication-access, and prescription purposes. He did not consent to disclosure to criminals or to use of the information for extortion, fraud, sale, or other unauthorized purposes.

111. Prescription and clinical information is inherently private. Its unauthorized disclosure reveals facts about a person's medical care and can enable highly convincing social-engineering and medical-identity schemes.

112. Many compromised data elements, including dates of birth, government or benefit identifiers, medical histories, medication histories, and provider relationships, cannot be readily changed. The resulting risk persists even if a password or payment card is replaced.

113. Plaintiff has spent time and effort investigating the Data Breach, reviewing records, identifying Defendants' role in his prescription transactions, and determining what protective steps may be necessary. That time was reasonably incurred because Defendants have not yet supplied a complete individualized account of the data taken.

114. Plaintiff reasonably expects to spend additional time monitoring communications, prescription and insurance records, medical records, financial accounts, credit files, and benefit activity for signs of misuse and responding to any suspicious activity.

115. The targeted nature of the intrusion, the alleged possession of the data by an extortion group, the alleged volume of exfiltration, and the sensitivity and persistence of the reported fields make the risk of misuse concrete and substantial rather than speculative.

116. Plaintiff and Class members also failed to receive the data-security and confidentiality performance Defendants undertook and represented when Defendants accepted and processed their Private Information.

117. Defendants continue to possess substantial quantities of patient information and have not publicly established that all deficiencies permitting the Data Breach have been fully remediated. Appropriate prospective relief is therefore necessary to the extent supported by the facts developed in this action.

## CLASS ACTION ALLEGATIONS

118. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of the following proposed Nationwide Class: All natural persons in the United States whose Private Information was accessed, acquired, exfiltrated, or otherwise compromised in the cybersecurity incident McKesson discovered on or about August 25, 2026.

119. Plaintiff also seeks certification of an Iowa Subclass defined as: All members of the Nationwide Class who were citizens or residents of Iowa at the time of the Data Breach.

120. Plaintiff further seeks certification of a McKesson Pharmacy-Technology Subclass defined as: All members of the Nationwide Class whose prescription, benefit, prior-authorization, patient-support, medication-access, or pharmacy-management information was processed through CoverMyMeds, EnterpriseRx, or related McKesson pharmacy technology and compromised in the Data Breach.

121. Excluded from the proposed classes are Defendants; their parents, subsidiaries, affiliates, officers, and directors; the judicial officers assigned to this case and their immediate family members and staff; and any person the Court determines should be excluded.

122. Plaintiff reserves the right to amend the class definitions as Defendants identify the affected applications, data elements, business lines, and persons.

123. Numerosity is satisfied because the proposed classes contain far more than 100 members and joinder is impracticable. Public reporting describes approximately 284 million raw

patient-related records, although the number of unique affected individuals remains under investigation.

124. Class membership is ascertainable from Defendants' affected-data inventories, access and export logs, patient and transaction identifiers, data maps, notification lists, and customer or provider records.

125. Common questions of law and fact include: (a) what applications and data were accessed and exfiltrated; (b) whether Defendants owed duties to safeguard Class members' Private Information; (c) whether Defendants' security practices were reasonable; (d) whether Defendants complied with their privacy and security undertakings; (e) whether Defendants timely detected, contained, investigated, and disclosed the Data Breach; (f) whether Defendants' conduct caused Class members' injuries; and (g) what damages and equitable relief are appropriate.

126. Plaintiff's claims are typical because, upon information and belief, his Private Information was processed through the same integrated prescription-technology, medication-access, and pharmacy-management ecosystem, was exposed through the same course of security conduct, and caused the same categories of privacy, confidentiality, monitoring, and benefit-of-the-bargain injuries as those suffered by other Class members.

127. Plaintiff will fairly and adequately protect the interests of the proposed classes. Plaintiff understands the obligations of a class representative, has no interests antagonistic to the classes, and has retained counsel experienced in complex, privacy, cybersecurity, and class-action litigation.

128. Common questions predominate because liability turns principally on Defendants' uniform systems, access controls, security governance, data-retention practices, incident response, representations, and conduct concerning the same Data Breach.

129. A class action is superior to individual actions because the claims arise from a common course of conduct; individual proceedings would duplicate discovery, create a risk of

inconsistent rulings, and be economically impracticable for many Class members.

130. Certification under Rule 23(b)(2) is appropriate to the extent Defendants have acted or refused to act on grounds generally applicable to the classes and uniform declaratory or injunctive relief is warranted. Certification under Rule 23(b)(3) is appropriate for damages and other monetary relief.

131. To the extent variations in state law become material, Plaintiff will seek certification of appropriate state-law subclasses, issue classes, or other groupings supported by the evidence and applicable law.

## COUNT I - NEGLIGENCE

(*On Behalf of Plaintiff and Applicable State-Law Subclasses*)

132. Plaintiff incorporates all preceding allegations as though fully set forth herein.

133. Defendants affirmatively collected, received, created, processed, stored, maintained, transmitted, and controlled Plaintiff's and Class members' highly sensitive Private Information.

134. Defendants owed Plaintiff and Class members duties under Texas law and, in the alternative, other applicable state law to exercise reasonable care in collecting, using, retaining, securing, and disclosing that information.

135. Those duties arose from Defendants' affirmative undertaking to process patient information for medication-access, prior-authorization, and pharmacy-management services; their exclusive control over the relevant systems and security measures; the foreseeability of cyberattacks against healthcare data; the sensitivity and persistence of the information; and Defendants' superior knowledge of the risks and safeguards.

136. Defendants also assumed duties by representing and undertaking that they would use appropriate physical, electronic, administrative, and technical safeguards; restrict access to

persons with a need to know; protect the confidentiality, integrity, and availability of electronic PHI; apply minimum-necessary principles; and report and mitigate unauthorized disclosures and security incidents.

137. The statutory and regulatory standards described above, including Tex. Bus. & Com. Code § 521.052(a) and the HIPAA Security Rule, further inform the reasonable standard of care. Plaintiff does not assert a standalone private cause of action under those provisions.

138. Defendants breached their duties by, among other things, failing to: (a) use phishing-resistant authentication and rigorous identity verification; (b) limit access according to least privilege; (c) segment and minimize patient data; (d) monitor and block anomalous bulk access and export; (e) securely configure and supervise third-party applications; (f) protect data from remaining readable after credential or session compromise; (g) adequately train and supervise personnel; (h) timely detect and contain the intrusion; and (i) implement the safeguards Defendants represented they would use.

139. The alleged social-engineering compromise and multi-day exfiltration of approximately one terabyte of data support the inference that one or more of those security failures occurred. The precise failures will be further established through discovery.

140. Defendants' breaches were actual and proximate causes of unauthorized access to and exfiltration of Plaintiff's and Class members' Private Information. The criminal attack does not sever causation because the foreseeable risk of criminal acquisition of inadequately protected healthcare data is the very risk that made Defendants' conduct negligent.

141. As a direct and proximate result, Plaintiff and Class members suffered actual loss of privacy and confidentiality, unauthorized disclosure and loss of control of Private Information, reasonably incurred investigation and mitigation time, expenses where incurred, continuing risk of identity and medical-identity misuse, and other legally cognizable damages.

142. Plaintiff and Class members are entitled to compensatory and nominal damages, pre- and post-judgment interest, costs, and other relief available under applicable law.

## COUNT II - BREACH OF IMPLIED CONTRACT

(*On Behalf of Plaintiff, the Iowa Subclass, and Other Applicable State Subclasses*)

143. Plaintiff incorporates all preceding allegations as though fully set forth herein.

144. In order for Defendants to perform prescription, prior-authorization, benefit, medication-access, and pharmacy-management services concerning Plaintiff and Class members, patients necessarily provided or permitted providers, pharmacies, pharmacy benefit managers, and payers to provide Defendants with Private Information.

145. Defendants knowingly accepted, processed, retained, and economically benefited from that information and the associated prescription and pharmacy transactions. The parties' conduct created an implied-in-fact agreement governing Defendants' use and protection of the information.

146. The implied agreement included definite and objectively ascertainable terms that Defendants would: (a) use patient information only for authorized healthcare, medication-access, and pharmacy-management purposes; (b) limit collection and use to information reasonably necessary for those purposes; (c) restrict access to personnel and contractors who needed the information and were bound by confidentiality obligations; (d) implement administrative, physical, electronic, and technical safeguards reasonably appropriate to the sensitivity of the data; (e) maintain the confidentiality, integrity, and availability of electronic PHI; (f) securely configure and monitor systems and subcontractors receiving PHI; and (g) timely respond to and report unauthorized access or disclosure.

147. Those implied terms are evidenced by the nature of the limited healthcare and pharmacy transactions, Defendants' course of performance, CoverMyMeds' public privacy notice,

CoverMyMeds' Terms of Service, the specific safeguards CoverMyMeds undertakes as a HIPAA business associate, McKesson's EnterpriseRx product representations, and McKesson's public cybersecurity representations.

148. Plaintiff does not allege that he is a third-party beneficiary of the CoverMyMeds Business Associate Agreement. The agreement and related representations instead provide evidence of the specific security performance Defendants understood and undertook when processing patient PHI.

149. Plaintiff and Class members performed by providing or permitting the transmission of accurate information and allowing Defendants to use it for the limited purpose of prescription, medication-access, and pharmacy-management processing.

150. Defendants breached the implied agreement by failing to provide the specified security and confidentiality performance and by permitting unauthorized criminal access to and exfiltration of the information.

151. Defendants' breach caused Plaintiff and Class members to lose the confidentiality and control promised as part of the transaction and deprived them of the data-security performance for which their information and participation were exchanged.

152. Plaintiff and Class members are entitled to actual, nominal, consequential, and other contract damages available under applicable law.

**COUNT III - UNJUST ENRICHMENT**

(*Pled in the Alternative on Behalf of Plaintiff and the Iowa Subclass*)

153. Plaintiff incorporates all preceding allegations as though fully set forth herein.

154. This Count is pled in the alternative to Count II to the extent no enforceable contract governs Defendants' obligations to Plaintiff and the Iowa Subclass.

155. Defendants received economic benefits from processing Plaintiff's and Class members' prescription, medication-access, and pharmacy-management transactions, including fees, revenue, commercial relationships, operational data, and other value generated by their integration with providers, pharmacies, payers, pharmacy benefit managers, health systems, and pharmaceutical manufacturers.

156. CoverMyMeds' terms describe medication-access services that use information supplied through its platform, while McKesson reports substantial revenue and operating profit from its Prescription Technology Solutions segment. Patient information and transaction participation are integral inputs to that commercial ecosystem.[21]

157. Plaintiff and Class members conferred those benefits by permitting their Private Information to be processed for limited healthcare, prescription, and pharmacy purposes under circumstances in which reasonable data security and confidentiality were expected.

158. Upon information and belief, Defendants also retained cost savings by failing to fund, implement, enforce, or maintain the full measure of security controls reasonably required for the sensitivity and volume of the data.

159. It would be inequitable for Defendants to retain the portion of transaction-derived benefits and cost savings attributable to security and confidentiality performance they failed to provide.

160. Plaintiff does not seek disgorgement of compensation for healthcare or prescription services actually provided. He seeks restitution limited to benefits attributable to the data-security and confidentiality performance not provided and the security costs wrongfully avoided, in an amount to be determined through discovery.

---

[21] CoverMyMeds, *Terms of Service* (July 1, 2023), https://www.covermymeds.health/about/privacy/terms-of-service; McKesson Corp., Annual Report (Form 10-K), at 42, 116 (May 8, 2026), https://www.sec.gov/Archives/edgar/data/927653/000092765326000069/mck-20260331.htm.

161. Plaintiff and the Iowa Subclass are entitled to restitution, disgorgement where available, constructive trust or equitable accounting as appropriate, and other equitable relief permitted by Iowa law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff William Hall, individually and on behalf of the proposed Classes, respectfully requests that the Court enter judgment in his favor and against Defendants and:

A. Certify the proposed Classes and appropriate subclasses under Federal Rule of Civil Procedure 23 and appoint Plaintiff as class representative and his counsel as Class Counsel;

B. Declare that Defendants' conduct violated the duties and obligations alleged in this Complaint;

C. Award Plaintiff and Class members compensatory, nominal, consequential, restitutionary, and other damages or monetary relief available under applicable law;

D. Award appropriate declaratory and injunctive relief, to the extent supported by the facts and Article III, requiring Defendants to remediate proven security deficiencies, improve identity and access controls, conduct appropriate independent security assessment, minimize and protect retained patient data, improve monitoring and data-loss prevention, and provide meaningful identity and medical-identity protection services;

E. Award restitution, disgorgement, equitable accounting, or other equitable relief where available;

F. Award pre-judgment and post-judgment interest;

G. Award reasonable attorneys' fees and litigation costs where authorized by law; and

H. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 31, 2026

Respectfully submitted,

**LANIER LAW FIRM, P.C.**

By: */s/ W. Mark Lanier*
W. Mark Lanier
Texas Bar No. 11934600
10940 W. Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Email: mark.lanier@lanierlawfirm.com

Jeff Ostrow*
**KOPELOWITZ OSTROW, P.A.**
1 West Las Olas Blvd, Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
Email: ostrow@kolawyers.com

Gary M. Klinger*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Nicholas Andrew Hall
**HALL ATTORNEYS, PC**
Texas Bar No. 24069863
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
Email: nhall@hallattorneys.com

**pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Proposed Classes*